# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF ARKANSAS
## FAYETTEVILLE DIVISION

**DANNY TRENT BARROWS**                                                      **PLAINTIFF**

**V.**                                    **CASE NO. 5:18-CV-05195**

**DEPUTY JEREMY COLLINS (Badge #512);**
**DEPUTY CHARLES GRIMES (Badge #559);**
**DEPUTY CODY REX (Badge #563);**
**DEPUTY COLE SELF (Badge #554);**
**DEPUTY TIM HAWKINS (Badge #557);**
**and DEPUTY DYLAN SIMPSON (Badge #552)**              **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Now before the Court is Defendants' Motion for Summary Judgment (Doc. 20).
Barrows filed a Response in Opposition to the Motion (Doc. 24), and the matter is now
ripe for decision.   For the reasons set forth below, the Motion is **GRANTED**.

## I.  BACKGROUND

The claims asserted in this case arose while Plaintiff Danny Trent Barrows was
incarcerated in the Washington County Detention Center ("WCDC") from September 4,
2018, to September 22, 2018. Barrows names as Defendants Deputies Collins, Grimes,
Rex, Self, Hawkins and Simpson.   With the exception of Deputy Simpson, Barrows has
sued the Defendants in both their individual and official capacities.   Deputy Simpson has
been sued only in his official capacity.

Barrows contends that his constitutional rights were violated when:   (1) he was
placed in administrative segregation ("A-seg") without having been charged with a
disciplinary infraction or provided with due process; and (2) he was subjected to

unconstitutional conditions of confinement—specifically, jail overcrowding and a leaky toilet in his jail cell—which created a punitive and unsafe environment.

On August 15, 2018, Barrows was arrested on various criminal charges. He had fled from police and, in a last-ditch effort to escape, had attempted to jump off a highway bridge. (Doc. 22-2 at 12). Barrows had to be dragged back onto the bridge by police officers. He was then taken to the WCDC and booked. The next day, August 16, 2018, jailers made a note in his file that he was to be placed on suicide watch. (Doc. 22-5 at 1). Barrows indicated to the officers at the time that he wanted to be placed in B-pod. *Id.* Sergeant Wingate advised Barrows that with his charges, he was sure to be classified as a medium- or maximum-security inmate and not eligible to be housed in B-pod. *Id.*

Barrows testified in his deposition that from the date of his arrest on August 15, 2018, until September 2, 2018, he was in isolation. (Doc. 22-8 at 29, 36). He claims he began suffering from anxiety at this time. *Id.* at 52. On September 2, Barrows was moved to A-seg where he spent two days in a cell by himself. *Id.* at 36. He was moved to cell P-14 on September 4 with detainees James Johnson, Luis Salazar, and Braden Collins. *Id.* at 36-37, 45. Around that time, Barrows's anxiety grew stronger, and he felt claustrophobic in cell P-14 with the three other men. *Id.* at 52. The cell was designed to house three people, not four. *Id.*

As soon as Barrows was moved to cell P-14, he noticed water leaking around the bottom edge of the toilet.[1] (Doc. 22-8 at 39). Specifically, he claimed that water was leaking all the way around the toilet at the point where it was attached to the floor. *Id.* at

---

[1] The WCDC utilizes a combined sink and toilet unit. (Doc. 22-8 at 59-60). The parties use the terms sink and toilet interchangeably in their briefing.

60. The water was "sludgy" and "slimy" looking, "smelled like sewage," and drew flies. *Id.* at 47. Barrows estimated that the toilet leaked at least a "good gallon of water" a day. *Id.* at 60. Barrows and his cell mates were given a blanket to wrap around the bottom of the toilet to keep the "spilled water and stuff from leaking out all over the middle of the floor." *Id.* at 19, 61. Barrows agreed that the blanket "soaked up most of the water." *Id.* at 60-61.

Barrows testified that he and his cell mates asked several officers to request that maintenance fix the toilet. (Doc. 22-8 at 18). However, no one from maintenance ever came. *Id.* at 18-19. Barrows testified that he and his cell mates were forced to eat in the cell every day. In addition, one inmate—not Barrows—had to sleep on the floor, and the blanket was soaked and "covered in sewage every day." Doc. 22-8 at 25. The blanket was only changed about once a week. *Id.*

Barrows testified that on September 6, he and his cell mates asked Deputy Collins, Deputy Grimes, and Deputy Bowman to be moved to a different cell. They also asked the officers to put in a work order for the toilet to be fixed. (Doc. 22-8 at 70). Barrows testified that the following day, they asked four officers on duty whether one person in the cell could be moved to an empty neighboring cell. *Id.* at 23, 70-71. According to Barrows, Deputy Collins agreed this would be a good idea. *Id.* Barrows and his cell mates asked Deputy Collins the same question later in the day, but he told them that his shift was ending, and no one would be moved to a different cell. *Id.*

Barrows testified that after that, he and his cell mates asked every officer on duty on almost a daily basis to move an inmate out of P-14. (Doc. 22-8 at 24). Barrows does

3

not know who was in charge of reviewing inmate classification and housing status in the jail. *Id.* at 39.

On September 9, Barrows submitted his first grievance. In that grievance, he complained that he was being kept in a twenty-three-hour-a-day lock-down cell with only one hour out. (Doc. 22-3 at 12). He also complained that his "hour out" was so early in the day that he could not make personal calls. *Id.* Barrows pointed out in his grievance that he and three other inmates had been housed for over a week in a three-man cell. *Id.* He also stated that the toilet was leaking in his cell, which meant that one of his cell mates was forced to sleep on a cramped, wet floor, since there were only three bunks in the cell. *Id.* Barrows claimed one of his cell mates, Collins, had asked numerous times to be moved. *Id.* Barrows also asserted that there was an unoccupied cell right beside his overcrowded one. *Id.* He contended the conditions in his cell amounted to cruel and unusual punishment and asked for a § 1983 form so that he could "follow up on this grievance." *Id.*

Barrows explained in his deposition that he had not submitted a grievance prior to this one because he knew that in most jails, the jailers required that the prisoner speak with the floor officer about the issue before submitting a formal grievance. (Doc. 22-8 at 48). This, however, was not the policy and practice of the WCDC. *Id.*

On September 11, Barrows's cell mate Johnson was moved out of the cell after he suffered a seizure and was taken to the hospital. (Doc. 22-8 at 22). Johnson returned to the cell the following day. *Id.* at 26. Also on September 11, Corporal Mulvaney responded to Barrows's September 9 grievance. In the response, Corporal Mulvaney

stated that Barrows's "hour-out" time was generally at around 8:00 a.m., with the exception of September 5, when the "hour out" took place at around noon, and September 8, when it took place around 6:45 a.m. (Doc. 22-3 at 13). Corporal Mulvaney also stated in his response to the grievance that he understood there were no longer four inmates assigned to Barrows's cell and that maintenance had been notified to address the leaking toilet. *Id.* Finally, Corporal Mulvaney explained that Barrows had been given an address to use to request § 1983 paperwork. He asked Barrows to state briefly what his complaint was about so that it could be documented, and he also asked Barrows whether any video needed to be saved in connection with the complaint. *Id.*

In reply to Corporal Mulvaney's written response, Barrows stated that inmate Collins had been moved into the cell on September 4. (Doc. 22-3 at 14). Barrows claimed that the following day, the cell next to P-14 was empty. *Id.* According to Barrows, he and his cell mates asked several times on September 5 for Collins to be moved. *Id.* Barrows indicated that they also asked Corporal Graham to move Collins during "morning chow on the following day." *Id.* Barrows ultimately testified in his deposition that all the officers he named as Defendants were asked if one of the four inmates in Barrows's cell could be moved out due to "overcrowding and the condition the cell was in." (Doc. 22-8 at 21).

On September 12, Barrows submitted another grievance in which he asked to be moved to B-Block. (Doc. 22-3 at 2). Barrows felt he should be housed in general population. (Doc. 22-8 at 56). Corporal Atchley responded that Barrows was classified as a medium 7 and "[i]n order to be in B-pod you must be classified as a minimum." (Doc.

5

22-3 at 2-3). Barrows was told that his next classification review was on October 14.
*Id.* at 3.

Barrows testified that late in the evening on September 13, when he got up to use the toilet, "my flipflop got hung up on the blanket [that had been wrapped around the toilet] causing me to twist my ankle, fall back. And I fell down and landed on my rear-end and when I did, it tore ligaments in my leg, as far as muscles in my ankle, and I twisted my ankle real bad." (Doc. 22-8 at 19, 44). Barrows did not fall onto Collins, who was sleeping on the floor, because Collins was lying against the back wall of the cell, farthest away from the leaking toilet. *Id.* at 45. Barrows testified that for days he was not able to walk after the incident and had to rely on other inmates to help him around. *Id.* at 19-20. Barrows testified that the injury is still causing him joint pain at nighttime and requires him to elevate his foot. *Id.* at 19.

Barrows submitted a medical request related to this foot injury the day after it occurred, September 14. In the medical request, he stated that he had slipped and fallen in his cell and could not walk. (Doc. 22-3 at 28, 44). Barrows was seen that day at sick call. *Id.* at 28. According to Barrows, the nurse told him she did not feel his foot was broken, so there was no need for an x-ray. (Doc. 22-8 at 48). Barrows testified the nurse told him that the injury "was probably torn ligaments" and torn "muscle tissue," basically, a "sprained ankle." *Id.* Barrows testified he asked for a wheelchair or crutches, and the nurse responded that there was a wheelchair in the facility he could use. *Id.* at 50. According to Barrows, Deputy Grimes indicated he would try to locate the wheelchair, but he never did. *Id.* at 50-51.

6

The nurse noted:

> Pt stating that he tripped over a blanket and twisted his foot during the night, then landing hard on his left heel.  Pt stated it felt like a stone bruise but was also sore during flexion of the foot when bearing weight on the plantar surface.  Pt stated that he did not feel that it was broken.  Pt has FROM [full range of motion], just advised that it was painful, no swelling or heat noted.  Will RX naproxen per protocol.  Advised Pt to elevate and report any further symptoms to medical.

(Doc. 22-4 at 12-13).  The Naproxen was prescribed two times a day until September 21.  *Id.* at 13.

On September 15, Barrows submitted a grievance "in hopes to get my toilet fixed in cell p 14 because of an injury [I've] got now because of the leaking sewage and blanket placed over it that caused me to twist my ankle and fall back on my [heel] causing problems now for me to get around."  (Doc. 22-3 at 15).  He also complained that the situation resulted in him incurring expenses for medical services due to his injury.  *Id.* Barrows asserted that he had been told by the floor officers that a maintenance call had already been placed, and Barrows asked if there was any way to speed it up.  *Id.*  In response, Officer Cody Stidham told Barrows that he would speak to maintenance.  *Id.*

On September 16, Barrows asked how he could get classified as a minimum-security inmate so that he could be moved to B-Block.  (Doc. 22-3 at 3).  Officer J. Velasco responded in writing, "you are a medium 7 so that is why your [sic] over in A-pod."  *Id.*

On September 19, Barrows submitted a request to be removed from A-seg to a different area of the jail.  (Doc. 22-3 at 3).  Barrows noted he had not been giving the officers any trouble.  *Id.* Sergeant Byrd responded that due to Barrows's pending

charges, he would not be allowed in B-pod. *Id.* However, Sergeant Byrd said if Barrows wanted out of A-seg, he would see what he could do. *Id.* Barrows responded that he wanted out of A-seg and had not caused any problems since he had been there. *Id.* at 4. Corporal Terry Warford responded that Barrows's request would be forwarded to a sergeant. *Id.* On September 20th, Barrows asked if a sergeant had looked at his request. *Id.* Sergeant Byrd responded that he would come and speak to Barrows soon. *Id.*

That same day, Barrows submitted a medical request stating he was still housed in A-seg and wondered if there was a medical reason why he was being kept there. (Doc. 22-3 at 29). In response, medical personnel informed him that he would need to speak with the officers about that. *Id.*

On September 21, Barrows submitted another grievance, asking again to be moved out of A-seg. (Doc. 22-3 at 5). He noted he had not caused any problems and had no disciplinary charges. *Id.* The following day, Deputy Atchley responded that Barrows would be moved. *Id.*

Barrows testified that on September 22, Sergeant Byrd moved him out of A-seg and into general population. (Doc. 22-8 at 24, 56, 68). Barrows indicated Deputy Grimes had been talking to Sergeant Byrd about him and helped get him moved. *Id.* at 68. However, Barrows maintains his legal claims against Deputy Grimes in this lawsuit are due to the overcrowding conditions Barrows claims he endured and Deputy Grimes's failure to get maintenance to fix the leaking toilet in Barrows's cell. *Id.*

Also on September 22, Barrows requested copies of the grievances he submitted

8

on September 9. (Doc. 22-3 at 6). He indicated that he needed a statement regarding his prisoner account to be completed to go along with his § 1983 paperwork. *Id*. Corporal Mulvaney responded on September 24, advising he would get the paperwork regarding Barrows's inmate account back to him that day. *Id*. Corporal Mulvaney declined to provide copies of the inmate account to Barrows and stated that during the process of the case, Barrows would be afforded copies of everything. *Id*. Corporal Mulvaney again asked what the complaint was concerning so that he could document it and to see if there was "any relevant video that may need to be saved." *Id*. at 7.

On September 25, Barrows submitted a medical request asking for something for pain in his ankle and heel. (Doc. 22-3 at 30). He indicated the pain was keeping him up at night. *Id*. He also noted that walking made his heel worse. *Id*. In response, Barrows was added to the sick call list. *Id*. Barrows was seen at sick call the following day. (Doc. 22-4 at 12). The nurse noted a full range of motion with no bruising or discoloration. *Id*. Barrows was prescribed Tylenol, told to rest and elevate his foot and ankle when possible, and to do gentle exercises to increase ankle strength. *Id*. The Tylenol was prescribed through October 10, on an as-needed basis twice a day. *Id*.

On September 26, Barrows submitted a medical request stating he had been told by the nurses to keep his ankle elevated when possible. (Doc. 22-3 at 31). He said he was having trouble keeping the ankle elevated and asked for a second blanket to help with this. *Id*. The following day, a note was made in his file that a second blanket was added and to "verify at AM med pass to receive it." *Id*.

When Barrows was asked to describe the policy, practice, or custom that he

9

believed caused his injury, he responded that it was "[j]ust the lack of maintenance." (Doc. 22-8 at 59). While Barrows did not believe any of the Defendants did maintenance work, he explained that "they are the ones that you're speaking to about putting maintenance calls in to be fixed." *Id.*

When Barrows was asked about the nature of his individual or personal capacity claims against each of the Defendants, Barrows responded they were the same for every Defendant. (Doc. 22-8 at 62-63). Barrows maintains that between September 4 and September 22, each Defendant was told multiple times about the conditions in P-14, specifically, the overcrowding and the leaky toilet. *Id.* Barrows kept track of the Defendants' names and badge numbers. *Id.* at 67. Barrows contends that all Defendants told him they would see about getting him moved to another cell and the toilet repaired, but those things never happened. *Id.*

Barrows did not write down the dates or keep count of how many times he asked each Defendant for assistance. (Doc. 22-8 at 63-64). Barrows was asked specifically about Deputy Collins, and Barrows conceded that he never submitted a written grievance concerning him. *Id.* at 63–64.

According to the affidavit of Corporal Mulvaney, cell P-14 measures 13 feet by 14 feet. (Doc. 22-1 at 2). Corporal Mulvaney states with regard to overcrowding:

> When the demands on the facility require that an inmate be housed on the floor of a cell, the housing is reviewed daily and the inmate is moved as soon as other space is available. In addition, with rare exception, inmates in segregation are provided with at least one hour out in a large day room of the pod where there is a great deal of room in which inmates can exercise, shower, make phone calls, communicate via kiosks, and other recreational activities.

10

*Id.*

Corporal Mulvaney asserts that "[i]nmates are classified based on their charges and criminal history and their housing may be modified as necessary based on detainee population and or the safety and security needs of the facility or specific detainees." (Doc. 22-1 at 2). The facility supervisor[2] makes the decision based on specific criteria whether to place an inmate in administrative segregation. *Id.* The decision is reviewed at stated intervals. *Id.*

Pod deputies may not change an inmate's housing assignment unless presented with an "emergency situation such as a medical emergency, an act of violence, or the threat of an act of violence. In any such situation, the decision of the deputy is considered temporary and will be reviewed by a facility supervisor as soon as possible." (Doc. 22-1 at 3). The WCDC "directs officers to report maintenance issues by submitting a help desk ticket." *Id.* at 4.

In the WCDC, "[a]dministration segregation or [d]isciplinary segregation may be used to segregate detainees whose behavior adversely affects the security or good order of the detention facility, or whose safety is at risk within the general population." (Doc. 22-1 at 3). The assignment to administrative segregation is made without a hearing but does not include any privilege restrictions. (Doc. 22-7 at 22).

The facility supervisor makes the decision to place a detainee in administrative segregation on the basis of specific criteria:

- Cannot adjust to the general population;
- Pose a serious threat to themselves, others, or the security of the

---

[2] The facility supervisor is not identified by name.

detention facility;

- Present a valid need for protection from other detainees as determined by the Facility Administrator (e.g., former law enforcement personnel);
- Have a communicable disease;
- Persons charged with infamous crimes;
- Witnesses.

(Doc. 22-7 at 22).

In addition, other factors include:

- A request for segregation by the detainee. Such a request shall be made in writing, signed and dated by the detainee.
- Observations or reports from officers of persistently disruptive or potentially disruptive behavior, or abnormal behavior that requires removal of the detainee from the general detainee population.
- A report from the facility physician or nurse.
- Apparent need for protection.
- Recommendation of Judge, Prosecutor, or arresting agency.

*Id.*

A detainee's assignment to administrative segregation may be indefinite but will be reviewed to determine if it remains appropriate. *Id.* During the first two months, the assignment is "reviewed at least every seven (7) days" and "at least every thirty (30) days thereafter, to determine if return to normal detention is possible." *Id.* at 23.

The WCDC has an established grievance procedure. (Doc. 22-1 at 3). Grievances are to be submitted via an electronic kiosk. *Id.* at 4. The Grievance Policy provides that grievances must be submitted "promptly after the incident has occurred and will be addressed by the duty supervisor or forwarded up the chain of command." (Doc. 22-7 at 28). The grievance "shall state fully the time, date, and names of the detention officers and/or staff members involved and pertinent details of the incident, including names of any witnesses." *Id.*

The WCDC detainee handbook, available on the kiosk, provides that "[a] grievance must be submitted within eight hours from the time the event complained of occurred." (Doc. 22-7 at 48; Doc. 22-1 at 4). The detainee is told the grievance should include the date and approximate time of the event; the names of the persons involved; the names of any witnesses and pertinent details of the event. (Doc. 22-7 at 48). No exception is made for inmates housed in administrative segregation who are only allowed out of their cells for one hour every twenty-four-hour period.

The WCDC was inspected by the Criminal Detention Facilities Review Committee of the State of Arkansas Department of Finance and Administration on May 8, 2018. (Doc. 22-6 at 1). Since 2017, the inmate population had been outpacing the site's capacity. *Id.* at 2. Specifically, the Committee reported that "[o]ne to two days per week, most housing areas will typically be overpopulated by 2 to 10 inmates." *Id.* A lack of space and programming staff has resulted in the jail struggling with regard to inmate/community programming goals and objectives. *Id.* Other than these issues, the jail was in compliance with all detention facility standards. *Id.*

## II. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific

facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## III. DISCUSSION

In this case, the material facts are not in dispute. In fact, Barrows concedes in his response that the "facts on the case for my behalf seem correct." (Doc. 24 at 1). The issue for the Court to decide is whether, based on those facts, the Defendants are entitled to summary judgment as a matter of law. Defendants' arguments are that Barrows: (1) failed to exhaust his administrative remedies; (2) failed to provide proof of any Defendant's personal involvement in the constitutional violations alleged; (3) failed to establish any facts that would demonstrate official-capacity liability; and (4) was not housed in unconstitutional conditions of confinement at the WCDC. Defendants also contend that if the Court finds that any of Barrows's constitutional rights were violated, Defendants are, nonetheless, entitled to qualified immunity. The Court will address each of Defendants' arguments in turn.

### A. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until

14

such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is mandatory. *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). "[T]o properly exhaust administrative remedies prisoners must complete the administrative review process in accordance with the applicable procedural rules." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (internal quotation marks and citation omitted).

The "level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.* A prisoner's remedies are exhausted "when [the] inmate pursues the prison grievance process to its final stage and receives an adverse decision on the merits." *Hammett v. Cofield*, 681 F.3d 945, 947 (8th Cir. 2012). Non-exhaustion is an affirmative defense. *Jones*, 549 U.S. at 211-12.

The Eighth Circuit Court of Appeals has recognized two exceptions to the PLRA exhaustion requirement: (1) when officials have prevented prisoners from utilizing the grievance procedures; or, (2) when the officials themselves fail to comply with the grievance procedures. *See Gibson v. Weber,* 431 F.3d 339, 341 (8th Cir. 2005) (explaining a prisoner is only required to exhaust those administrative remedies that are "available" and any remedies that prison officials prevent a prisoner from utilizing are not considered available).

### 1. Timeliness Requirement

Defendants maintain that Barrows did not submit his grievances in a timely manner. The WCDC grievance procedures (as set forth in WCDC policy D11.5) require

a grievance to be submitted "promptly" after an incident has occurred. (Doc. 22-7 at 28). However, the detainee handbook states that the grievance must be filed "within eight hours from the time the event complained of occurred." *Id.* at 48.

Here Barrows complains of three incidents: his assignment to A-seg on September 4; the overcrowding of his cell from September 4 to September 22; and his toilet leaking from September 4 to September 22. The first grievance Barrows filed was dated September 9. (Doc. 22-3 at 15).

Barrows's assignment to A-seg occurred on September 4. Given that an inmate in A-seg is confined to his cell for twenty-three hours a day, Defendants may well have prevented Barrows from filing a grievance within eight hours of his initial assignment. However, nothing precluded Barrows from filing a grievance on these issues from September 5 through September 8 during his hour out each day. Similarly, as Barrows contends the overcrowding and toilet issue existed as far back as September 4, he had ample opportunity to file grievances as to these issues prior to September 9.

However, in this instance, the conditions complained of by Barrows allegedly continued to exist, unabated, until September 22, at which time Barrows was released from A-seg and was no longer housed in P-14 with three other inmates and a leaky toilet. Because all three conditions Barrows complains of still existed on September 9, the date he submitted his grievance, the Court finds that the grievance was timely filed.

### 2. Specificity Requirements

The second issue to consider is whether the grievance Barrows submitted met the specificity requirements of the jail's grievance procedure. To meet those requirements,

16

the grievance must "state fully the time, date, and names of those detention officers and/or staff members involved and pertinent details of the incident, including the names of witnesses." (Doc. 22-7 at 28).

As discussed above, exhaustion means "using all steps that the agency holds out and doing so *properly* (so that the agency addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (emphasis in original; citation and internal quotation marks omitted). In *Hammett v. Cofield*, the Court of Appeals for the Eighth Circuit addressed an issue not discussed in *Woodford*—"whether a grievance that could have been denied for failure to comply with a procedural requirement is nonetheless exhausted if the institutional decision-maker instead denied it on the merits." *Hammett*, 681 F.3d at 947. The Eighth Circuit joined other circuits in holding that the benefits of the exhaustion requirement "are fully realized when an inmate pursued the prison grievance process to its final stage and receives an adverse decision on the merits, even if the decision-maker could have declined to reach the merits because of one or more procedural deficiencies." *Id.* The Court noted that "[t]his rule also takes into account the likelihood that prison officials will benefit if given discretion to decide, for reasons such as fairness or inmate morale or the need to resolve a recurring issue, that ruling on the merits is better for the institution and an inmate who has attempted to exhaust available prison remedies." *Id.* at 948.

The Court finds that on September 11, Corporal Mulvaney addressed the merits of Barrows's September 9 grievance. Therefore, for purposes of summary judgment, Barrows is deemed to have properly exhausted the grievance procedure as to his claims.

17

## B. No Proof of Defendants' Personal Involvement

Defendants argue that, to the extent Barrows claims that he wanted to be moved out of his cell in administrative segregation to another area of the jail, the named Defendants lacked the authority to move him except in the event of a security issue, a medical emergency, or a threat of violence in the cell. Defendants maintain that since they each lacked the authority to move Barrows out of A-seg, given the circumstances surrounding his request, he cannot assert an actionable Section 1983 claim against them based on their failure to take action.

The record reflects that the WCDC has a procedure for assigning inmates to administrative segregation. (Doc. 22-7 at 22-23). As set out above, the decision is made by the facility supervisor on the basis of certain criteria. The individually named Defendants are "pod deputies." By affidavit, Corporal Mulvaney states that pod deputies may not decide to change a housing assignment except in an emergency situation, and even then, the decision is only temporary, subject to review by the facility supervisor.

To establish liability under § 1983, Barrows must establish that each Defendant, through his own actions, violated the Constitution. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Here, none of the Defendants was directly responsible for or personally involved in the decision to assign Barrows to A-seg or to review his assignment to A-seg. None of Barrows's requests to be moved out of A-seg were responded to by the named Defendants. Accordingly, Barrows's individual capacity claims based on his placement in A-seg fail.

## C. Official-Capacity Liability

Barrows also sues the Defendants in their official capacities, arguing that the

WCDC's policy of assigning him to A-seg in the first place or failing to remove him quickly upon his request violated his constitutional rights. To hold a governmental entity liable, a plaintiff must establish that a municipal policy or custom caused the deprivation of his constitutional rights. *City of Canton v. Harris*, 489 U.S. 378, 389-91 (1989). This requires a plaintiff to prove the custom or policy was the moving force behind the constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "Further, municipal officials who have final policymaking authority may, by their actions subject the government to Section 1983 liability." *Russell v. Hennepin Cnty.*, 420 F.3d 841, 846 (8th Cir. 2005) (internal quotation marks and citation omitted).

Barrows makes no argument that the WCDC's A-seg policy was unconstitutional on its face, or that the WCDC had notice of the inadequacy of its policy, or that there was a custom of failing to follow the policy. If, for the sake of argument, the Court assumed that the jail wrongfully applied the A-seg policy with respect to Barrows's situation, a "single incident of allegedly failing to follow official policy may rise to the level of negligence. It does not, however, suffice to establish causation as required to advance a claim of municipal liability under § 1983." *Russell*, 420 F.3d at 948. Accordingly, Barrows's official capacity claim based on the jail's A-seg policies will be dismissed.

### D. Conditions of Confinement

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend VIII. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993). In this case, Barrows was a pretrial detainee at the

19

time relevant to this case. The claims of pretrial detainees are analyzed under the Fourteenth Amendment rather than the Eighth Amendment. *Davis v. Oregon Cnty., Mo.*, 607 F.3d 543, 548 (8th Cir. 2010). This distinction makes little difference because "'[p]retrial detainees are entitled to the same protection under the Fourteenth Amendment as imprisoned convicts receive under the Eighth Amendment.'" *Id.* (quoting *Kahle v. Leonard*, 477 F.3d 544, 550 (8th Cir. 2007)).

In *Davis,* the Eighth Circuit discussed the applicable standard for claims brought under the Eighth Amendment. The Court stated:

> The Eighth Amendment standard for conditions of confinement is whether the defendants acted with deliberate indifference. A prison official is deliberately indifferent if he knows of and disregards a substantial risk to an inmate's safety. There is both an objective component and a subjective component to a claim of deliberate indifference, which questions: (1) whether a substantial risk to the inmate's safety existed, and (2) whether the officer had knowledge of the substantial risk to the inmate's safety but nevertheless disregarded it. The subjective component requires that the official was both aware of facts from which the inference could be drawn that a substantial risk of harm existed, and he must also draw that inference. An official's negligence alone is insufficient to meet the subjective component because the official must recklessly disregard a known, excessive risk of serious harm to the inmate.

*Id.* at 548-49 (internal quotation marks and citations omitted).

As a preliminary matter, Barrows has not stated how any of the Defendants were personally responsible for causing the overcrowding of cell P-14 or for failing to repair the leaky toilet. Instead, Barrows argues that they failed to take appropriate action to remedy these conditions in a timely fashion. Barrows does not dispute Corporal Mulvaney's statements that pod deputies cannot make housing assignments except in emergency situations, and then only on a temporary basis, or that pod deputies can only report

maintenance issues by submitting a help-desk ticket. (Doc. 22-1 at 3-4). Regardless, the Court finds that none of the conditions of confinement identified by Barrows in his Complaint rise to the level of a constitutional violation.

### 1. Overcrowding

Beginning with the allegation that the jail was overcrowded, the undisputed facts show that Barrows was only subjected to those conditions from September 4–10, and again from September 12–22—a total of eighteen days. During this period of time, there were four inmates assigned to one cell and one inmate (not Barrows) forced to sleep on the floor. It is well settled that "overcrowding alone is insufficient to create a due process violation." *A.J. by L.B. v. Kierst*, 56 F.3d 849, 854 (8th Cir. 1995). For a violation to exist, the overcrowding must have "led to deprivations of essential food, medical care, or sanitation" or have led to an increase in inmate violence. *Patchette v. Nix*, 952 F.2d 158, 163 (8th Cir. 1991) (citation omitted). In evaluating overcrowding claims, courts may look to a number of factors, including the size of the living space, the length of time spent in the cell each day, the length of confinement, and the opportunity for exercise. *Kierst*, 56 F.3d at 855.

According to Defendants, P-14's dimensions are 13 feet by 14 feet, a total of 182 square feet, equating to 45.5 square feet per inmate. The available square footage is an important factor in determining whether an inmate has been subjected to unconstitutional conditions of confinement. For example, in *Campbell v. Cauthron*, 623 F.2d 503, 507–08 (8th Cir. 1980), the Eighth Circuit found that when inmates in a county jail were confined to their cell for sixteen hours or more a day, the maximum number of inmates

allowed in each cell measuring 130 x 154 square feet was four inmates. That equated to 32.5–38.5 square feet per inmate. However, if the inmates were held in the cell for more than a week, a more appropriate number of inmates for that square footage would be three inmates—yielding 43.3–51.3 square feet per inmate. *Id.* at 506.

In *Hall v. Dalton*, 34 F.3d 648, 649 (8th Cir. 1994), the Eighth Circuit reasoned that an inmate confined to a windowless cell for forty days along with three other individuals (equating to 14.22 square feet per person), was subjected to unconstitutional conditions of confinement under the *Campbell* standards. In *Bell v. Wolfish*, 441 U.S. 520 (1979), a case involving pretrial detainees, the Supreme Court upheld as constitutional an inmate's confinement to a cell measuring approximately 37.5 square feet. *Id.* at 542. And in *Rhodes v. Chapman*, 452 U.S. 337 (1981), the Supreme Court found that that a practice called "double-celling"—which provided each inmate with only 31.5 square feet of space—"did not lead to deprivations of essential food, medical care, or sanitation," an increase in violence, or "create other conditions intolerable for prison confinement." *Id.* at 348.

"The duration of an inmate's confinement, while not itself a controlling factor in Eighth Amendment analysis, nonetheless helps to gauge the cumulative burden of the deprivations that the inmate has endured. A relatively short exposure to harsh conditions is less onerous than a protracted exposure, and courts have, therefore, looked to the length, as well as the severity of . . . confinement as one element of its constitutional validity." *Johnson v. Anderson,* 370 F. Supp. 1373, 1387 (D. Del. 1974); *see also Hutto v. Finney,* 437 U.S. 678, 685 (2015) (finding that the length of confinement cannot be

ignored in deciding whether overall conditions of confinement violate the Eighth Amendment); *Williams v. Delo*, 49 F.3d 442, 445 (8th Cir. 1995) (inmate failed to establish that conditions in the strip cell denied him the minimal civilized measure of life's necessities where he was placed in the strip cell for four days, had no clothing or bedding, the water was shut off, and he was provided no hygiene items).

Considering Barrows's allegations regarding overcrowding in the light most favorable to him, the Court observes that the 45.5 feet of square footage available to him in his cell, coupled with the relatively short (eighteen-day) duration of confinement, are both factors that weigh against finding an Eighth Amendment violation. Looking at the totality of the circumstances in this case, Barrows was confined to P-14 for twenty-three hours a day, but for one hour per day, Barrows had access to a larger area and was able to use the telephone, exercise, and take a shower during that hour each day. Barrows at all times had access to running water, a sink, and a toilet while confined in P-14. Even though the toilet leaked, the inmates in the cell were provided a blanket to contain the leaking water. Barrows had a bunk to sleep on at all times, and his basic human needs for food, clothing, and shelter were met. Finally, although Barrows contends that his anxiety increased while he was housed in P-14, *see* Doc. 22-8 at 52, he testified that he suffered from anxiety before his assignment to that cell and that his anxiety did not decrease when he was removed from A-seg, *id.*

### 2. Leaky Toilet and Ankle/Foot Injury

"To prevail on a condition-of-confinement claim, inmates and pretrial detainees must show (1) the condition was serious enough to deprive them of the minimal civilized

measure of life's necessities, or to constitute a substantial risk of serious harm, and (2) officials were deliberately indifferent to the inmates' or detainees' health and safety." *Frye v. Pettis Cnty. Sheriff Dep't*, 41 F. App'x 906. 907 (8th Cir. 2002). With respect to the leaky toilet and to Barrows's ankle/foot injury he sustained after tripping over the blanket wrapped around the toilet, the Court finds that no constitutional violation has been stated. First, there are no facts to show that Barrows was deprived of the minimal civilized measure of life's necessities. He had access to food, clean water, a bed to sleep in, and a toilet that was usable and capable of flushing. His complaint is that the toilet leaked water that was "sludgy" and "slimy" looking, "smelled like sewage," and drew flies.

Under facts very similar to these, the Eighth Circuit has failed to find any constitutional violation that would support a § 1983 claim. In *Frye v. Pettis County Sheriff Department,* a pretrial detainee named Anderson Frye was placed in a cell with a toilet that leaked both sewage and fresh water. 41 F. App'x. at 907. Frye complained to his jailers both orally and in writing about the toilet—just as Barrows did here—and in response, Frye's jailers provided him with blankets to help absorb the leakage but did not move him to another cell. *Id.* at 907. Frye eventually slipped on standing water that had been leaking from the toilet. He fell and struck his head on the toilet and sustained a concussion and sprains in his back and knees. He also claimed that he suffered permanent hearing loss and seizures as a result of the head injury. *Id.* The Court of Appeals affirmed the trial court's dismissal of the case on summary judgment, finding that there had been no showing of deliberate indifference by the jail's deputies because they had "responded to the complaints and tried to remedy the problem" by providing blankets

for Frye to wrap around the toilet and by calling for a plumber. Id. at 908. The Court observed that "[u]ndoubtedly, the blankets helped." Id.

Assuming the facts in the instant case in the light most favorable to Barrows, the Court finds that the Defendants were not deliberately indifferent to his complaints about the toilet. Barrows acknowledges that the deputies requested that maintenance come and fix the toilet and provided Barrows with a blanket to wrap around the toilet, which was changed periodically. These actions taken by Defendants are enough, under the precedent set forth in Frye, to establish they were not deliberately indifferent to Barrows's health and safety. "The fact that the remedies fell short of curing the problem does not show the officials were deliberately indifferent . . . ." Id. For all of these reasons, both of the conditions-of-confinement claims will be dismissed.[3]

### E. Qualified Immunity

The Court need not engage in a qualified-immunity analysis in this case, as it already found that none of Barrows's claims amount to the deprivation of a constitutional right. See Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012) (explaining that an official may be entitled to qualified immunity if the facts show that the plaintiff has been deprived of a constitutional right and that the right was clearly established at the time of the deprivation).

---

[3] To the extent Barrows's Complaint may also be construed to state a claim for official-capacity liability arising from the conditions of his confinement, such a claim is subject to dismissal. Since Barrows's conditions of confinement did not result in the deprivation of his constitutional rights, no official-capacity claim is stated.

## IV.   CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment (Doc. 20) is

**GRANTED**, and this action is **DISMISSED WITH PREJUDICE.**

A separate judgment will enter contemporaneously.

**IT IS SO ORDERED** on this **15th** day of November, 2019.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE